UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

– against –

JAMAL LAURENT,

Defendant.

MEMORANDUM
&ORDER

11-CR-322

JACK B. WEINSTEIN, Senior United States District Judge:

Appearances:

Defendant:         Donna R. Newman, Esq.
                   Buttermore Newman Delanney & Foltz LLP
                   111 Broadway
                   Suite 1805
                   New York, NY 10006

Government:        Tiana A. Demas
                   United States Attorneys Office
                   271 Cadman Plaza East
                   Brooklyn, NY 11201

                   Zainab Ahmad
                   United States Attorneys Office
                   for the Eastern District of New York
                   271 Cadman Plaza East
                   Brooklyn, NY 11201

I.    Introduction ................................................................................................................. 2
II.   Facts ............................................................................................................................. 3
   A.   Prior State Indictment................................................................................................ 4
   B.   Indictment Under 18 U.S.C. § 922(n) ...................................................................... 4
III.  18 U.S.C. § 922(n) ...................................................................................................... 5
   A.   Prohibitions ............................................................................................................... 5

1

B.    Legislative History .................................................................... 6

C.    Government Interest at Stake .................................................. 10

D.    Prior Constitutional Challenges ............................................ 11

IV.    Background ................................................................................ 12

A.    Federal Grand Jury ................................................................ 12

B.    Rights of Individuals Under Arrest or Indictment ............... 16

C.    Treatment of Unconvicted Conduct ...................................... 19

V.    Constitutionality of 18 U.S.C. § 922(n) ................................. 20

A.    Facial vs. As Applied Challenges ......................................... 20

B.    Fifth Amendment Notice Requirement ................................. 21

C.    The Presumption of Innocence .............................................. 23

D.    Second Amendment ............................................................... 26

    1.    The Right to Bear Arms ................................................... 27

    2.    Substantial Burden .......................................................... 30

    3.    Level of Scrutiny ............................................................. 31

    4.    18 U.S.C. § 922(n) .......................................................... 38

E.    Equal Protection .................................................................... 39

F.    Procedural Due Process ......................................................... 41

    1.    Private Interest at Stake ................................................... 43

    2.    Risk of Erroneous Deprivation ....................................... 44

    3.    Government Interest at Stake ........................................... 44

VI.    Conclusion ................................................................................ 45

## I.    Introduction

Defendant Jamal Laurent is charged with receipt of a firearm and ammunition while under indictment for a crime punishable by a term of imprisonment exceeding one year in violation of 18 U.S.C. § 922(n). On October 18, 2011, an order was issued asking the parties to show cause why the indictment should not be dismissed on the grounds that § 922(n) is unconstitutional. Several concerns were raised, including that the statute may violate equal protection, the Fifth Amendment's notice requirement, and the presumption of innocence.

Defendant also argues that the statute violates his Second Amendment right to keep and bear arms. Def.'s Mem. of L. in Supp. of Mot. to Dismiss, Doc. Entry 45, Nov. 17, 2011.

Challenges to the statute are substantial. Under § 922(n), the fact of an indictment in any jurisdiction for any felony converts otherwise lawful activity—the shipping, transportation, or receipt of a firearm—into a crime. At the time the defendant commits this act, he has not been convicted of any crime. He has not seen the evidence against him, or had the other protections of due process, including an opportunity to present his own version of events. Nor has there been any independent judicial determination that he poses a danger to the community. Despite the absence of these procedural protections, the statute permits the government to not only deprive someone of a constitutional right, but to punish the exercise of that right with criminal sanctions.

It is questionable whether the broad prohibition of the statute is necessary to achieve the Congressional goals. Public safety could be arguably protected by judges making an individual determination regarding whether the defendant is sufficiently dangerous to be deprived of his Second Amendment rights as a condition of bail. *See* 18 U.S.C. § 3142(c)(1)(B)(xiv).

The issues raised by defendant pose the question: is it necessary to impinge on a fundamental constitutional right with an ironclad rule when the same interest in public safety can be equally served while providing more procedural protections to defendants. Even if the statute does not violate the presumption of innocence, equal protection, or the Second Amendment, does it run afoul of the Fifth Amendment right to procedural due process?

For the reasons stated below, defendant's motion to dismiss is denied, *subject* to the government's demonstrating that the defendant's contact with the weapon occurred *after* indictment.

**II.    Facts**

3

## A. Prior State Indictment

On June 21, 2010, an individual ("Victim 1") residing at 1445 Schenectady Avenue, Brooklyn, New York reported to the New York City Police Department (NYPD) that someone shot a bullet through the wall of his apartment from the adjoining room. Compl. ¶ 2. Shortly thereafter, the defendant entered Victim 1's room. *Id.* He apologized for the shooting and asked Victim1 not to report the incident to the police. *Id.*

Later that day, NYPD officers entered the defendant's room and observe a nine millimeter pistol, a spent shell casing, and a bag of marijuana. *Id.* ¶ 3. Although Laurent was present when the NYPD first arrived, he fled the scene on foot shortly thereafter. *Id.*

Defendant was arrested by NYPD officers on July 11, 2010 in connection with the June 21st incident. *Id.* ¶ 4. On July 29, he was indicted in Kings County Supreme Court for: 1) criminal possession of a weapon in the second degree; 2) reckless endangerment in the first degree; 3) reckless endangerment in the second degree; and 4) criminal possession of a weapon in the fourth degree. *Id.* ¶ 5. Both the first and second counts charged are punishable by a term of imprisonment exceeding one year. *Id.*

Laurent was arraigned on the indictment on August 24, 2010. *Id.* The charges are still pending. *Id.* He currently faces one felony charge in New York State and may be permitted to plead guilty to a misdemeanor. Def.'s Mem. of L. in Supp. of Mot. to Dismiss 2 n.2, Doc. Entry 45, Nov. 17, 2011.

## B. Indictment Under 18 U.S.C. § 922(n)

Eight months after his initial indictment, two NYPD officers witnessed an altercation between defendant and another victim ("Victim 2"). Victim 2 shouted to the officers that he was being robbed and that the defendant had a gun. Compl. ¶ 7. When Laurent fled the scene, the

4

officers pursued him. *Id.* They caught up with him while he was attempting to hide behind a tree. *Id.* The officers ordered him to come out with his hands up; Laurent complied and was placed under arrest. *Id.* When officers searched the area behind the tree, they located a .38 caliber revolver, a brown wallet, and $3,000 in cash. *Id.* ¶ 8. Victim 2 identified the wallet and cash as his.

On May 9, 2011, the defendant was arraigned on a single-count indictment for violating 18 U.S.C. § 922(n).

## III.    18 U.S.C. § 922(n)

### A. Prohibitions

18 U.S.C. § 922 imposes a wide range of restrictions on gun manufacture, transportation, sale, and possession. It does not prohibit the transportation or receipt of guns generally. Rather, it regulates the transportation, receipt, or possession of guns by certain classes of individuals. It provides, in relevant part, that:

> It shall be unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(n). Under the statute, the fact that the defendant has been indicted for any felony converts the otherwise lawful act of transporting or receiving a gun into criminal conduct. It thus both limits the ability of indictees to access weapons and applies criminal sanctions to the exercise of that liberty. It does so categorically, without requiring an independent determination of dangerousness. It imposes significant penalties for this crime, including imprisonment of up to five years. 18 U.S.C. § 924(a)(1).

5

The charged statute does not prohibit *possession* of a weapon by someone under indictment, but only shipping, transportation, or receipt. Other subsections of 18 U.S.C. § 922 criminalizes gun possession, as well as transportation and receipt, by several categories of individuals, including convicted felons. 18 U.S.C. § 922(g). Individuals under indictment, however, are not included in this list. This omission indicates an intent not to criminalize mere possession of firearms by indictees. *See Keene Corp. v. United States,* 508 U.S. 200, 208 (1993) ("[W]hen Congress includes particular language in one section of a statute but omits it in another . . . it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

The legislative history of the act supports the interpretation that "[p]ersons under indictment are prohibited from receiving or transporting firearms but may continue to possess them." H.R. Rep. No. 495, 99th Cong., 2d Sess. 1986, 1986 U.S.C.C.A.N. 1327, 1349; *see also United States v. Bass,* 404 U.S. 336, 343 & n.10 (1971) (noting that Title IV of the Omnibus Crime Control and Safe Streets Act of 1968, of which an earlier version of § 922(n) was a part, "apparently does not reach possessions or intrastate transactions at all, even those with an interstate commerce nexus, but is limited to the sending or receiving of firearms as part of an interstate transportation"). In order to prove the defendant guilty of violating § 922(n), the government must establish that he shipped, transported, or received the gun after his indictment.

### B. Legislative History

The federal government and many states now limit indictees access to guns. *See, e.g., Gun Laws: Prohibited Persons (Most Recent) By State,* StateMaster.com, http://www.statemaster.com/graph/gov_gun_law_pro_per-government-gun-laws-prohibited-persons#source (last visited Nov. 18, 2011). This limitation is of comparatively recent vintage.

Prior to 1923, at least seven state legislatures had adopted bans on the carrying of concealed weapons by violent offenders. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 702, 707–09 (citing Handbook of the National Conference of Commissioners on Uniform State Laws and Proceedings of the Thirty–Fifth Annual Meeting 862–63 (1925)); *see also State v. Hogan*, 58 N.E. 572, 574–75 (Oh. 1900) (holding that a state law banning "tramps," or roaming beggars, from carrying firearms protected "every honest man, woman and child" from the threat of theft, robbery, and murder).

The first federal statute limiting the right of individuals under indictment to access firearms was enacted in 1938. Federal Firearms Act of 1938, c. 850, § 2(e), 52 Stat. 1250, 1251. It prohibited individuals under indictment for, or convicted of, a crime of violence from shipping or transporting any firearms or ammunition in interstate commerce. *Id.* It also proscribed possession of firearms by any fugitive from justice, *id.,* as well as by violent felons and misdemeanants. *Id.* § 2(f), 52 Stat. 1250, 1251. "Crimes of violence" were commonly understood to include only those offenses "ordinarily committed with the aid of firearms." Marshall, *supra,* at 702. As described by one court:

> The evils sought to be corrected by Congress through the Federal Firearms Act,
> 15 U.S.C.A. § 901 et seq., are well known—the practice of roaming racketeers
> and predatory criminals who know no state lines—a situation beyond the power
> of control by local authorities to such an extent as to constitute a national menace.

*United States v. Platt*, 31 F. Supp. 788, 790 (S.D. Tex. 1940) (citing Record of Hearings on H.R. 9066 Before the House Committee on Ways and Means, 73rd Congress). Congress enacted the statute in order to "eliminate the guns from the crooks' hands, while interfering as little as possible with the law-a-biding citizen." S. Rep. No. 82, 75th Cong., 1st Sess. 2 (1937). It thus "sought to protect the public by preventing the transportation and possession of firearms and

ammunition by those who, by their past conduct, had demonstrated their unfitness to be entrusted with such dangerous instrumentalities." *Cases v. United States,* 131 F.2d 916, 921 (1st Cir. 1942).

In 1961, Congress expanded the prohibition of § 2(e) to encompass all individuals under indictment, regardless of the crime they were accused of. Act of Oct. 3, 1961, Pub.L.No. 87-342, 75 Stat. 757. The Act was intended "[t]o strengthen the Federal Firearms Act," *id.,* and "make it more difficult for the criminal elements of our society to obtain firearms," S. Rep. No. 364, 87th Cong., 1st Sess. 2 (1961). Introduced at the request of the Attorney General, the legislation was an integral part of an anti-crime program. S. Rep. No. 364, 87th Cong., 1st Sess. 2 (1961). In recommending that section 2(e) and other portions of the Act be amended, the House Ways and Means Committee reported that in the late 1950's and early 1960's "the infiltration of racketeering into society and the exploding crime rate have increasingly become a cause for national concern." 2 U.S. Code Cong. and Admin. News, p. 3068, 87th Cong. 1st Sess. (1961). New laws were needed "so the Federal Government can better assist local authorities in the common assault against crime." *Id. See also* S. Rep. No. 364, 87th Cong., 1st Sess. 2 (1961). Accordingly, Congress deleted the words "crime of violence" in section 2(d), (e) and (f) of the 1938 Act and inserted the words "crime punishable by imprisonment for a term exceeding one year." Act of Oct. 3, 1961 § 2, Pub.L.No. 87-342, 75 Stat. 757.

The scope of the statute was again expanded by Gun Control Act of 1968. Pub. L. 90-618, 82 Stat. 1213 (codified at 18 U.S.C. § 921 *et seq.*). The Act clarified the definition to include an information or indictment in *any court*—state or federal—if the court had power to prosecute any crime punishable by more than one year in prison. *Id.* § 921(a)(14), 82 Stat. 1216 (defining indictment as "an indictment or information in *any* court under which a crime

8

punishable by imprisonment for a term exceeding one year may be prosecuted"). The statute was designed to require the indictment to be a felony, emphasizing the crime rather than the indicting court's jurisdiction. S. Rep. No. 1501, 90th Cong., 2d Sess., 1968 U.S. Code Cong. and Admin. News 2112, 2201 (1968) ("Inasmuch as a person under indictment for certain crimes is proscribed from shipping or receiving firearms in interstate or foreign commerce and a license will not be issued to such a person, the definition makes it clear that either *an indictment or an information in any court for a felony* comes within the meaning of the term." (emphasis added)). It criminalized receipt of a firearm or ammunition "by any person . . . *who is under indictment for*, or who has been convicted in any court of, *a crime punishable by imprisonment for a term exceeding one year*." Gun Control Act of 1968 § 922(h)(1), 82 Stat. 1219-20 (emphasis added). It also continued to criminalize the shipping or transportation of firearms or ammunition. *Id.* § 922(g)(1), 82 Stat. 1219.

> As described by the Supreme Court:

> [T]he 1968 Act reflects a . . . concern with keeping firearms out of the hands of categories of potentially irresponsible persons, including convicted felons. Its broadly stated principal purpose was "to make it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency." S. Rep. No. 1501, 90th Cong., 2d Sess., 22 (1968). See also 114 Cong. Rec. 13219 (1968) (remarks by Sen. Tydings*); Huddleston v. United States*, 415 U.S. [814] at 824-825 . . . .

*Barrett v. United States*, 423 U.S. 212, 220 (1976).

The Act sought to combat violence and promote public safety. *See United States v. Pruner*, 606 F.2d 871, 874 (9th Cir. 1979); *United States v. Haddad*, 558 F.2d 968, 972 (9th Cir. 1977); *United States v. Turcotte*, 558 F.2d 893, 896 (8th Cir. 1977). "[M]aximiz[ing] the possibility of keeping firearms out of the hands of [felons]" was the method used. 114 Cong.

Rec. 21784 (1968). At the same time, Congress affirmed its intent not to interfere with "law-abiding citizens'" rights:

> [I]t is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or any other lawful activity, and that this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes.

S. Rep. No. 1501, 90th Cong., 2d Sess., 22 (1968).

In 1986, Congress again revised the statute to combine § 922(g)(1) and (h)(1) into a single section, § 922(n). Firearms Owners' Protection Act, Pub. L. 99-308, 100 Stat 449. In passing the Act, Congress found that "the rights of citizens . . . to keep and bear arms under the second amendment to the United States Constitution; . . . and assurance of due process of law under the fifth amendment . . . require additional legislation to correct existing firearms statutes and enforcement policies." *Id.* § 1. Congress also thought it necessary to reaffirm its intent not to "to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes." *Id.* Subsequent amendments to the statute have not changed the language of section 922(n) or the content of its prohibitions.

### C. Government Interest at Stake

The government's interest is of critical importance in evaluating the statute's constitutionality. Substantial legislative history indicates that it is supported by an important government interest in public safety.

In its report on the Gun Control Act of 1968, the Senate found that "[t]he ready availability; that is, ease with which any person can anonymously acquire firearms (including criminals . . . and others whose possession of firearms is similarly contrary to the public interest) is a matter of serious national concern." S. Rep. No. 1501, 90th Cong., 2d Sess., 1968

U.S.C.C.A.N. 2112, 2113 (1968). It was believed that crime and racketeering could be curtailed nationwide by limiting the ability of those whose past records demonstrated a propensity to engage in such activity from transporting or receiving weapons in interstate commerce.

"The federal gun control statute is designed to prohibit the ownership of firearms not only by individuals who have already committed dangerous acts, but also by those with a potential for violence as well." *United States v. Waters,* 23 F.3d 29, 34 (2d Cir. 1994). Specifically, Congress concluded that individuals under indictment "have a somewhat greater likelihood than other citizens to misuse firearms" *United States v. Munsterman,* 177 F.3d 1139, 1142 (9th Cir. 1999); *United States v. Graves,* 554 F.2d 65, 72 (3d Cir. 1977); *see also United States v. Weingartner*, 485 F. Supp. 1167, 1172 (D.N.J. 1979) ("Congress could rationally conclude that persons indicted for non-trade regulation offenses punishable by a term of imprisonment exceeding one year have a significantly greater propensity for the misuse of firearms than the population as a whole.").

The Supreme Court has explained that "[t]he government's interest in preventing crime by arrestees is both legitimate and compelling." *United States v. Salerno*, 481 U.S. 739, 749 (1987); *see also United States v. Skoien*, 614 F.3d 638, 642 (7th Cir. 2010) ("[N]o one doubts that the goal of . . . preventing armed mayhem, is an important governmental objective."); *Schenck v. Pro–Choice Network,* 519 U.S. 357, 376 (1997) (referring to the "significant governmental interest in public safety"). This interest is heightened "when the Government musters convincing proof that the arrestee, already indicted or held to answer for a serious crime, presents a demonstrable danger to the community." *Salerno,* 481 U.S. at 750. The absence on an individual determination of dangerousness limits the government interest at stake.

**D. Prior Constitutional Challenges**

11

The Supreme Court has not ruled on the constitutionality of 18 U.S.C. § 922(n) or its predecessor statutes. Several district courts and courts of appeals have found that the statute does not violate the Commerce Clause, *United States v. Gaines,* 295 F.3d 293, 302 (2d Cir. 2002); the equal protection secured by the Fifth Amendment, *United States v. Craven,* 478 F.3d 1329 (6th Cir. 1973); the presumption of innocence, *United States v. Thoresen,* 428 F.2d 654, 661(9th Cir. 1970); *Craven,* 478 F.3d 1329; or the Second Amendment, *United States v. Rivero,* 218 Fed. Appx. 958, 958 (11th Cir. 2007). *See also United States v. Brown,* 484 F.2d 418, 424 (1973) (holding that a statute that criminalized transporting a firearm while under indictment does not violate the presumption against innocence). Although the Court of Appeals for the Second Circuit has noted in a stray reference that 18 U.S.C. § 922(n) "prohibit[s] the possession of firearms by individuals under indictment, even though they are presumed innocent under the law," *United States v. Waters,* 23 F.3d 29, 34 (2d Cir. 1994), it has not ruled on the constitutionality of the statute outside the context of the Commerce Clause. Notably, no court has ruled on a constitutional challenge to the statute since *District of Columbia v. Heller,* 554 U.S. 570 (2008) held that the Second Amendment protects an individual right to bear arms.

## IV.   Background

In order to understand the nature of the deprivation enacted by the statute, some background on the federal grand jury and the rights of individuals under indictment is necessary.

### A.   Federal Grand Jury

An indictment is not a finding of guilt beyond a reasonable doubt, nor even by a preponderance of the evidence. It requires only two things: 1) that a prosecutor actually seek indictment; and 2) that a grand jury conclude that there is probable cause to believe that the

defendant is guilty of the charged crime. The grand jury is not required to hear either exculpatory evidence or the defendant's version of events.

Federal grand jury proceedings are not limited by the procedural protections guaranteed to defendants at trial. *Costello v. United States*, 350 U.S. 359, 362 (1956) ("[N]either the Fifth Amendment nor any other constitutional provision prescribes the kind of evidence upon which grand juries must act."). As the Supreme Court has noted, "the whole history of the grand jury institution" is one "in which laymen conduct their inquiries unfettered by technical rules." *Id.* at 364.

> Traditionally the grand jury has been accorded wide latitude to inquire into violations of criminal law. No judge presides to monitor its proceedings. It deliberates in secret and may determine alone the course of its inquiry. The grand jury may compel the production of evidence or the testimony of witnesses as it considers appropriate, and its operation generally is unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials. "It is a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime." *Blair v. United States*, 250 U.S. 273, 282 . . . (1919).

*United States v. Calandra*, 414 U.S. 338, 343 (1974).

Federal grand juries have enormous power to consider a wide range of evidence, regardless of whether that evidence is reliable or would be admissible at trial. They may consider hearsay. *Costello*, 350 U.S. at 363. They may hear evidence that would ordinarily be barred by the Fourth Amendment's exclusionary rule, *Calandra*, 414 U.S. 338 (1974), or obtained in violation of a defendant's Fifth Amendment privilege against self-incrimination, *Lawn v. United States*, 355 U.S. 339 (1958).

A defendant has a limited ability to inquire into the propriety of a grand jury's determinations, even if that determination is based on incompetent, irrelevant, or

unconstitutionally-obtained evidence. *See Costello*, 350 U.S. at 364 (refusing to establish a rule that would permit defendants to challenge indictments on the ground that they are not supported by adequate or competent evidence); *cf. Holt v. United States*, 218 U.S. 245 (1910) (refusing to quash an indictment although "there was very little evidence against the accused" and some of the available evidence was incompetent); *Blair*, 250 U.S. at 282 (stating that a witness in a grand jury proceeding "is not entitled to urge objections of incompetency or irrelevancy, such as a party might raise, for this is no concern of his"). Defense attorneys are not allowed in the grand jury room. Transcripts are rarely made available.

The great power and discretion vested in the grand jury reduces delay. *See Costello*, 350 U.S. at 363-64. "In some cases the delay might be fatal to the enforcement of the criminal law." *Calandra*, 414 U.S. at 349. However, it also brings with it the potential for mistake and abuse.

"[M]any lawyers and judges have expressed skepticism concerning the power of the Grand Jury." *United States v. Navarro-Vargas*, 408 F.3d 1184, 1195 (9th Cir. 2005) (en banc). This skepticism was best summarized by the Chief Judge of one state in 1985 when he stated that a grand jury could indict a "ham sandwich." *Id.* (citing *In re Grand Jury Subpoena of Stewart*, 144 Misc.2d 1012, 545 N.Y.S.2d 974, 977 n.1 (N.Y. Sup. Ct. 1989), *aff'd as modified*, 156 A.D.2d 294, 548 N.Y.S.2d 679 (N.Y.App.Div.1989)). While "the modern grand jury technically remains an independent body . . . as a practical matter, it relies heavily on the prosecutor to secure evidence and give the jurors legal advice." John Decker, *Legislating New Federalism: The Call for Grand Jury Reform in the States*, 58 Okla. L. Rev. 341 (2005). Federal grand juries indict in the overwhelming number of cases brought by prosecutors. *Navarro-Vargas*, 408 F.3d at 1195 (citing Federal Justice Statistics Database, Federal Justice Statistics Resource Center, http://fjsrc.urban.org (last visited January 5, 2005) (noting that federal grand juries returned only

14

twenty-one no-bills in 2001)). Because of this, many criticize the modern grand jury as no more than a "rubber stamp" for the prosecutor. 1 Sara Sun Beale, et al., Grand Jury Law and Practice § 1:1 (2d ed. 2001); Marvin E. Frankel & Gary Naftalis, The Grand Jury: An Institution on Trial 22 (2d ed. 1977) ("Day in and day out, the grand jury affirms what the prosecutor calls upon it to affirm—investigating as it is led, ignoring what it is never advised to notice, failing to indict or indicting as the prosecutor 'submits' that it should."); Peter Arenella, *Reforming the Federal Grand Jury and the State Preliminary Hearing to Prevent Conviction Without Adjudication,* 78 Mich. L. Rev. 463, 474 (1980) (noting "the grand jury's tendency to rubberstamp the prosecutor's decisions"); William J. Campbell, *Eliminate the Grand Jury,* 64 J. Crim. L. & Criminology 174, 174 (1973) (noting that "the grand jury is the total captive of the prosecutor who, if he is candid will concede that he can indict anybody at any time, for almost anything, before any grand jury"); Melvin P. Antell, *The Modern Grand Jury, Benighted Supergovernment,* 51 A.B.A. J. 153, 153–54 (1965) (asserting that the grand jury is an "archaic ... instrument[ ]" that does little to safeguard defendants).

Because of the ease of indictment, courts have long been troubled by the possibility that individuals may suffer the collateral consequences of an indictment that is fundamentally wrong. *See, e.g., United States v. Serubo*, 604 F.2d 807, 817 (3d Cir. 1979) ("[W]hile in theory a trial provides a defendant with a full opportunity to contest and disprove the charges against him, in practice, the handing up of an indictment will often have a devastating personal and professional impact that a later dismissal or acquittal can never undo."); *In re Fried*, 161 F.2d 453, 458 (2d Cir. 1947) ("[A] wrongful indictment is no laughing matter; often it works a grievous, irreparable injury to the person indicted. The stigma cannot easily be erased. In the public mind, the blot on a man's escutcheon, resulting from such a public accusation of wrongdoing, is seldom wiped out

15

by a subsequent judgment of not guilty. Frequently, the public remembers the accusation, and still suspects guilt, even after an acquittal.").

## B. Rights of Individuals Under Arrest or Indictment

While an indictee is presumed innocent, *see* Part V(C), *infra,* an indictment "is not without legal consequences."

> It establishes that there is probable cause to believe that an offense was committed, and that the defendant committed it. Upon probable cause a warrant for the defendant's arrest may issue; a period of administrative detention may occur before the evidence of probable cause is presented to a neutral magistrate. . . . Once a defendant has been committed for trial he may be detained in custody if the magistrate finds that no conditions of release will prevent him from becoming a fugitive.

*United States v. Salerno,* 481 U.S. 739, 764 (1989) (Marshall, J., dissenting).

Nevertheless, arrest or indictment has historically had a limited effect on an individual's constitutional rights. The most common consequence of indictment is pre-trial detention. *See* Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq.*; *Salerno,* 481 U.S. 739. This deprivation of liberty is accompanied by substantial procedural protections. After indictment, federal defendants are arraigned before a judge. At this hearing, the judge has the power to remand the defendant to federal custody; to release the defendant on his own recognizance; or to set bail. 18 U.S.C. § 3141(a) (requiring a judicial officer to determine whether an arrestee shall be detained). The defendant may request the presence of counsel at the detention hearing; testify and present witnesses in his behalf; proffer evidence; cross-examine other witnesses appearing at the hearing. 18 U.S.C. § 3142(f). The judge may only order pre-trial detention "[i]f, after a hearing . . . , the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," 18 U.S.C. § 3142(e), based on "clear and convincing evidence," 18 U.S.C. § 3142(f). The court

16

must consider the nature and seriousness of the charges, the substantiality of the government's evidence against the arrestee, the arrestee's background and characteristics, and the nature and seriousness of the danger posed by the suspect's release. 18 U.S.C. § 3142(g). The judge may also condition the defendant's release on compliance with certain pre-trial restrictions.

The Supreme Court has indicated that such procedural protections are necessary to prevent infringing on the rights of defendants pre-trial. In *Salerno*, the Supreme Court upheld the ability of a federal court to detain an arrestee before trial on a finding by "clear and convincing" evidence that detention is the only way to reasonably insure the safety of the community. *Salerno*, 481 U.S. at 741. The provision withstood constitutional scrutiny because it included these procedural protections. The Court declared:

> [T]he Government must first of all demonstrate probable cause to believe that the charged crime has been committed by the arrestee, *but that is not enough.* In a full-blown adversary hearing, the Government must convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person....

*Id.* at 751-52 (internal citations omitted) (emphasis added).

An indictee may also be subject to pre-trial release conditions that infringe upon his constitutional rights, provided that there has been an independent judicial determination that such conditions are necessary. *Compare, e.g.,* 18 U.S.C. § 3142(c)(1)(B)(xiv) ("If the judicial officer determines that the release described in subsection (b) of this section will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community, such judicial officer shall order the pretrial release of the person . . . subject to the least restrictive further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community, which may include the condition that the person . . . satisfy any

17

other condition that is reasonably necessary to assure the appearance of the person as required

and to assure the safety of any other person and the community."); *Berry v. District of Columbia,*

833 F.2d 1031, 1036 (D.C. Cir. 1987) (stating that drug testing and treatment as a condition of

pre-trial release would likely be constitutional if "there is an individualized determination that an

arrestee will use drugs while released pending trial"); *with United States v. Scott,* 450 F.3d 863,

874 (9th Cir. 2006) (holding that a pretrial release condition imposed under state law requiring

that the defendant consent to random drug testing and the searching of the defendant's home

violated the Fourth Amendment in the absence of any judicial determination that such condition

was necessary); *United States v. Polouizzi,* 697 F.Supp.2d 381 (E.D.N.Y. 2010) (holding that

requirement that individuals under arrest for child pornography charges be required to undergo

electronic monitoring as a condition of pre-trial release unconstitutional); *United States v.*

*Merritt,* 612 F.Supp.2d 1074, 1079 (D. Neb. 2009) (same); *United States v. Rueb,* 612 F.Supp.2d

1068, 1073 (D. Neb. 2009) (same); *United States v. Smedley,* 611 F.Supp.2d 971, 976 (E.D. Mo.

2009) (same); *United States v. Arzberger,* 592 F. Supp. 2d 590 (S.D.N.Y. 2008) (same); *United*

*States v. Torres,* 566 F.Supp.2d 591, 598 (W.D. Tex. 2008) (same); *United States v. Crowell,*

Nos. 06-M-1095, 06-CR-291, 06-CR-304, 2006 WL 3541736, at *10 (W.D.N.Y. Dec. 7, 2006)

(same).

    An arrest can trigger other collateral consequences, such as loss of public housing or

employment. *See, e.g.*, 24 C.F.R. § 966.4(1)5(iii)(A) (stating that in conventional public

housing, a Public Housing Authority may terminate assistance "regardless of whether the

covered person has been arrested or convicted for such activity and without satisfying the

standard of proof used for a criminal conviction"); 24 C.F.R. § 982.553(c) (describing an

analogous provision for Section 8 vouchers); K. Babe Howell, *Broken Lives from Broken*

*Windows: The Hidden Costs of Aggressive Order Maintenance Policing,* 33 N.Y.U. Rev. L. &

Soc. Change 271, 304-05 (2009) (describing the effects of arrest on employment). These

deprivations may occur without significant procedural protections. *See* 42 U.S.C. 1437d(k)

(stating that tenants must be given an opportunity to contest a termination of tenancy through the

public housing authority's grievance procedure); 24 C.F.R. § 966.51(a)(2) (excluding evictions

based on certain types of tenant criminal activity may be excluded from the grievance

requirement, including evictions for drug-related criminal activity on or near the premises or

criminal activity that threatens the health, safety, or peaceful enjoyment of the premises of other

tenants).

There is limited history of laws criminalizing otherwise lawful conduct simply because

an individual is under indictment. Generally, indictees are deprived of their constitutional rights

only following an individual determination. Convicted felons, by contrast, are often subject to

categorical deprivations of constitutional rights. *See, e.g., McKune v. Lile,* 536 U.S. 24, 38

(2002) ("[L]awful conviction and incarceration necessarily place limitations on the exercise of a

defendant's privilege against self-incrimination."); *Jones v. Helms,* 452 U.S. 412, 419 (1981)

(upholding restrictions on a felon's fundamental right to travel); *Richardson v. Ramirez,* 418 U.S.

24, 54–56 (1974) (upholding a state law disenfranchising felons on the basis of criminal

conviction). Such deprivations may be justified, in part, because the factfinder has already made

an individual determination of guilt beyond a reasonable doubt, removing the presumption of

innocence and the protections it provides.

### C. Treatment of Unconvicted Conduct

Reliance on unconvicted conduct—i.e., conduct that has not been proven beyond a

reasonable doubt—to sanction defendants is constitutionally suspect. Trial courts may rely on

19

unconvicted conduct to select an appropriate sentence from a range of possible sentences. *E.g.*

*United States v. Watts*, 519 U.S. 148 (1997); *McMillan v. Pennsylvania,* 477 U.S. 79, 87-88

(1986). It is prohibited, however, to rely on unconvicted conduct to sentence defendants above

the maximum term permissible under the facts established at trial. *Apprendi v. New Jersey*, 530

U.S. 466, 490 (2000) ("Other than the fact of a prior conviction, any fact that increases the

penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and

proved beyond a reasonable doubt."); *but see Almendarez-Torres v. United States,* 523 U.S. 224

(1998) (holding that defendant could be sentenced above the maximum for the offense alleged in

the indictment; because he admitted to unconvicted conduct during his plea allocution, no

question concerning the right to a jury trial or the standard of proof that would apply to a

contested issue of fact was before the Court). The government cannot circumvent the protections

of the Due Process Clause merely by "redefin[ing] the elements that constitute different crimes,

characterizing them as factors that bear solely on the extent of punishment." *Mullaney v. Wilbur,*

421 U.S. 684, 698 (1975).

## V.     Constitutionality of 18 U.S.C. § 922(n)

### A. Facial vs. As Applied Challenges

"To successfully challenge a statute on its face, the challenger must show that no set of

circumstances exists under which the Act would be valid." *Ohio v. Akron Ctr. for Reproductive*

*Health,* 497 U.S. 502, 514 (1990); *see also United States v. Salerno,* 481 U.S. 739, 745 (1987)

("A facial challenge to a legislative Act is ... the most difficult challenge to mount successfully,

since the challenger must establish that no set of circumstances exists under which the Act would

be valid."); *see Diaz v. Paterson,* 547 F.3d 88, 101 (2d Cir. 2008) (applying *Salerno* standard in

evaluating facial constitutional challenge). *But see Washington v. Glucksberg,* 521 U.S. 702,

20

739-40 (1997) (Stevens, J., concurring) (observing that standard for assessing facial challenges has been the subject of debate in the Supreme Court).

In an as-applied challenge, the question is whether the statute would be unconstitutional if applied literally to the facts of the case. *Cf. Field Day LLC v. County of Suffolk,* 463 F.3d 167, 174 (2d Cir. 2006). Factual context and defendant's circumstances are critical. *See, e.g., Arzberger,* 592 F. Supp. 2d at 599. A sequential analysis, putting off facial challenges, permits the courts to protect the constitutional rights of individual defendants in particular situations, while avoiding the unnecessary striking down of a congressional enactment. *See Washington State Grange v. Washington State Republican Party,* 552 U.S. 442, 450 (2008) (noting that facial invalidation contravenes the "fundamental principle ... that courts ... should [not] formulate a rule of constitutional law broader than is required by the precise facts to which it is applied").

The defendant challenges the statute on its face. Def.'s Mem. of L. in Supp. of Mot. to Dismiss 2-3, Doc. 45, Nov. 17, 2011. He also argues that the fact that he may plead guilty to a misdemeanor renders it unconstitutional as applied to him.

### B. Fifth Amendment Notice Requirement

Concerns that § 922(n) may violate the Fifth Amendment's notice requirement, *see* Order, Doc. Entry 34, Oct. 18, 2011, are without merit. Although the statute does not specifically state that a defendant must know that he is under a felony indictment, courts have implied such a requirement.

In order to be convicted under 18 U.S.C. § 922(n), the defendant must "willfully" commit a violation of the statute. *See* 18 U.S.C. § 924(a)(1)(2); *Dixon v. United States,* 548 U.S. 1 (2006). Conduct is "willful" under § 924(a)(1)(D) if the defendant to has "acted with an evil-

meaning mind, that is to say, that he acted with knowledge that his conduct was unlawful." *Bryan v. United States,* 524 U.S. 184, 193 (1998).

The statute does not, on its face, require that the defendant know that he was indicted in order to be convicted under the statute. While the Court of Appeals for the Second Circuit has not ruled on whether such knowledge is required, other courts of appeals have held that the government must prove that the defendant knew that he was under indictment. *United States v. Forbes,* 64 F.3d 928, 934 (4th Cir. 1995); *United States v. Hayden,* 64 F.3d 126, 133 (3d Cir. 1995) ("[I]f a defendant knows he has been indicted or deliberately avoids ascertaining his status, and thereafter purchases a firearm, he will have satisfied the knowledge requirement of § 922(n)."); *United States v. Ballentine,* 4 F.3d 504, 506 (7th Cir. 1993) ("Because there is a possibility that an indictment will remain sealed, a knowledge requirement would appear to be necessary to address the circumstance of a defendant's receiving a firearm while subject to an undisclosed sealed indictment. Without such a requirement, there could be unintended strict liability."), *cert. denied,* 510 U.S. 1179 (1994); *United States v. Indelicato,* 800 F.2d 1482, 1483 (9th Cir. 1986); *United States v. Renner,* 496 F.2d 922, 926 (6th Cir. 1974) (requiring that defendant know that he is under indictment because "special circumstances that may surround one under indictment, *i.e.,* he may not be aware of the fact that he has been indicted because of failure to serve him on a secret indictment"); *cf. United States v. Chambers,* 922 F.2d 228, 241 (5th Cir. 1991) ("[T]he requirement that the jury find that Chambers had knowledge of the existence of the indictment at the time he purchased the firearm and signed the form was clearly stated in the jury charge."). At least one court has stated that the defendant need not know that the crime for which he is indicted is punishable by a year or more of incarceration. *Hayden,* 64 F.3d at 133 n.12.

22

A defendant must have knowledge of the fact that he is under indictment for a crime that is punishable by a year or more of incarceration. As so interpreted, the Fifth Amendment's notice requirement is satisfied.

## C. The Presumption of Innocence

Individuals have the fundamental right to be free from punishment unless and until the underlying conduct has been proven beyond a reasonable doubt at a jury trial. U.S. Const. amend. V, XIV; *In re Winship,* 397 U.S. 358 (1970) (holding that due process protects the right to have every element of the offense proved beyond a reasonable doubt to a jury). Although not specifically mentioned in the Constitution, an important component of this right is the presumption of innocence. *Estelle v. Williams,* 425 U.S. 501, 503 (1976); *see also United States v. Jackson,* 368 F.3d 59, 65 (2d Cir. 2004) ("[T]he Supreme Court made clear that the presumption of innocence and the requirement of proof beyond a reasonable doubt . . . are imbedded in the Fifth Amendment's command that 'no person shall . . . be deprived of . . . liberty . . . without due process of law.").

"The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Coffin v. United States,* 156 U.S. 432, 453 (1895). The doctrine "allocates the burden of proof in criminal trials" and "serve[s] as an admonishment to the jury to judge an accused's guilt or innocence solely on the evidence adduced at trial and not on the basis of suspicions that may arise from the fact of his arrest, indictment, or custody, or from other matters not introduced as proof at trial." *Bell v. Wolfish,* 441 U.S. 520, 533 (1979); *see also In re Winship,* 397 U.S. 358, 362 (1970) ("The [reasonable doubt] standard provides concrete substance for the presumption of innocence-that bedrock 'axiomatic and elementary'

23

principle whose 'enforcement lies at the foundation of the administration of our criminal law.'").
The prosecution thus "bears the burden of proving all elements of the offense charged and must
persuade the fact finder beyond a reasonable doubt of the facts necessary to establish each of
those elements." *Sullivan v. Louisiana*, 508 U.S. 275, 277-78 (1993) (internal citations and
quotations omitted).

The presumption of innocence affords the accused broad protections. In *Estelle v.
Williams*, for example, the Supreme Court held that the accused may not be brought before the
jury in prison attire. 425 U.S. at 504-05. The Court found that "the constant reminder of the
accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment.
The defendant's clothing is so likely to be a continuing influence throughout the trial that . . . an
unacceptable risk is presented of impermissible factors coming into play." *Id.* *But see Illinois v.
Allen*, 397 U.S. 337, 344 (1970) (recognizing that "the sight of shackles and gags might have a
significant effect on the jury's feelings about the defendant . . . ," but upholding the practice
when necessary to control a persistently disorderly defendant).

Outside the context of a criminal trial, the presumption of innocence has limited
application. It does not prohibit the state from restricting the rights of arrestees who are detained
while awaiting trial. In *Bell v. Wolfish*, the Court of Appeals for the Second Circuit relied on the
presumption in crafting a stringent test for whether conditions of confinement violated the rights
of pretrial detainees. *Bell,* 441 U.S. at 533. The Supreme Court rejected both the test and its
reasoning, finding that the presumption of innocence "has no application to a determination of
the rights of a pre-trial detainee during confinement before his trial has even begun." *Id.* The
presumption also does not continue once a jury has determined that the defendant is guilty.
*Herrera v. Collins*, 506 U.S. 390, 399 (1993) ("Once a defendant has been afforded a fair trial

24

and convicted of the offense for which he was charged, the presumption of innocence disappears."). Notably, in both cases the Court found that the presumption did not protect a defendant's constitutional rights where there had been some kind of independent judicial determination, either of guilt or of the need for detention.

Given the narrow scope of the right, the instant statute does not violate the presumption of innocence. *Thoresen,* 428 F.2d at 661; As the Ninth Circuit has explained:

> It does not authorize a fact finder at the criminal trial to infer guilt . . . from the existence of a prior indictment or even to discount the credibility of a witness because of such an indictment. . . . It represents nothing more than a . . . Congressional finding that persons under indictment . . . may have a propensity for misusing firearms.

*Thoresen,* 428 F.2d at 661; *see also Craven,* 478 F.2d at 1340; *United States v. Brown,* 484 F.2d 418, 424 (5th Cir. 1973); *United States v. Friday,* 404 F. Supp. 1343, 1345 (E.D. Mich. 1975). The government is still required to prove every element of the offense beyond a reasonable doubt. The fact that an individual is under indictment is simply another element of the offense to be proved; it may raise equal protection concerns, but not due process concerns. *Thoresen,* 428 F.2d at 661 ("Whether such Congressional finding results in an unreasonable classification contrary to equal protection principles is a separate question . . . .").

While the presumption of innocence is not violated by the instant statute, it must inform the analysis of the effect of the statute on the rights of individuals under indictment. The presumption of innocence is not impaired by indictment. From a normative perspective, individuals under indictment are considered innocent under the law, just as other members of the general public. Individuals under indictment must be treated as far as is practicable in a manner similar to the general public.

The presumption of innocence requires close scrutiny of the statute.

The assumption that [a defendant is] more likely to commit crimes than other members of the public, without an individualized determination to that effect, is contradicted by the presumption of innocence. That an individual is charged with a crime cannot, as a constitutional matter, give rise to any inference that he is more likely than any other citizen to commit a crime if he is released from custody. Defendant is, after all, constitutionally presumed to be innocent pending trial, and *innocence can only raise an inference of innocence, not guilt.*

*United States v. Scott,* 450 F.3d 863, 874 (9th Cir. 2006) (emphasis added). *But see Thornton v. United States,* 541 U.S. 615, 630 (Scalia, J., concurring) ("The fact of prior lawful arrest distinguishes the arrestee from society at large"). Nevertheless, the presumption itself is not a sufficient ground to declare the statute unconstitutional.

### D. Second Amendment

The contours of the Second Amendment right to bear arms following *District of Columbia v. Heller,* 554 U.S. 570 (2008), are unsettled in this circuit. The scope of the right, as well as the level of scrutiny to be applied, is unclear.

In evaluating the constitutionality of a statute under the Second Amendment since *Heller,* most Courts of Appeals have applied a two prong test. First, they have evaluated whether the act in question imposes a substantial burden on the right to bear arms for the purpose of self-defense in the home. Only those acts that impose such a burden merit heightened scrutiny. Second, they have evaluated whether the statute survives scrutiny. *United States v. Marzzarella,* 614 F.3d 85, 89 (3d Cir. 2010); *United States v. Reese,* 627 F.3d 792, 800 (10th Cir. 2010); *see generally Nordyke v. King,* 644 F.3d 776 (9th Cir. 2011). This two prong test is adopted based on general consensus to date. The majority of courts of appeals, in applying intermediate scrutiny to restrictions on the right to bear arms by "dangerous" individuals, appear to have taken an appropriate view of the issue.

As applied to the defendant in this case, the statute at issue survives such scrutiny.

## 1. The Right to Bear Arms

The Second Amendment provides that "[a] well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. It confers an individual right to keep and bear arms specifically for the purpose of self-defense. *Heller,* 554 U.S. at 628 ("[T]he inherent right of self-defense has been central to the Second Amendment right."); *id.* at 630 (describing self-defense as the "core" purpose of the Second Amendment); *McDonald v. City of Chicago,* 130 S.Ct. 3020, 3036 (2010) ("[I]n *Heller,* we held that individual self-defense is 'the *central component* [ ]' of the Second Amendment right.") (emphasis in original); *see also United States v. Barton,* 633 F.3d 168, 170–71 (3d Cir. 2011) ("At the 'core' of the Second Amendment is the right of 'law-abiding, responsible citizens to use arms in defense of hearth and home.'"); *United States v. Masciandaro,* 09 Civ. 4839, 2011 WL 1053618, at *9 (4th Cir. Mar. 24, 2011) (finding that "there now exists a clearly-defined fundamental right to possess firearms for self-defense within the home[,]" but that there remains uncertainty as to the "scope of that right beyond the home"); *United States v. Reese,* 627 F.3d 792, 800 (10th Cir. 2010) ("[T]he [ *Heller* ] Court suggested that the core purpose of the [Second Amendment] right was to allow 'law-abiding, responsible citizens to use arms in defense of hearth and home.'").

Only those regulations that substantially burden the right to keep and bear arms for the purpose of self-defense run afoul of the Second Amendment. *See Heller,* 554 U.S. at 595 ("The right was not unlimited, just as the First Amendment's right of free speech was not . . . [W]e do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose.*"); *id.* at 626 ("[T]he right [to bear arms] was not a right to keep and carry any

27

weapon whatsoever in any manner whatsoever and for whatever purpose."); *see also McDonald v. City of Chicago,* 130 S.Ct. 3020, 3047 (2010) (reiterating the limits on the right to bear arms); Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense,* 56 UCLA L. Rev. 1443, 1456–57 (2009) (noting that *Heller* struck down the handgun ban because it made "self-defense materially more difficult" and that the *Heller* Court's "analysis suggested that the severity of the burden was important").

The right to self-defense in the home belongs to "law-abiding citizens for lawful purposes." *Heller,* 554 U.S. at 627. It does not prohibit government regulation of firearms outside of the home; or limitations on ownership of certain firearms, or prevent it from limiting the use of firearms for specific purposes or by specific people.

The Second Amendment right only extends to those weapons typically possessed for the purpose of lawful self-defense. *Heller,* 554 U.S. at 627 (interpreting *United States v. Miller,* 307 U.S. 174 (1939)) (stating that "the Second Amendment right . . . extends only to certain types of weapons"; in light of the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" the right to bear arms, as codified in the Second Amendment, affords no protection to "weapons not typically possessed by law-abiding citizens for lawful purposes"); *United States v. Tagg,* 572 F.3d 1320, 1326 (11th Cir. 2009) (holding that the Second Amendment does not encompass a right to keep and bear pipe bombs because they cannot be used for legitimate lawful purposes).

Similarly, the "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms" were "longstanding" and "presumptively lawful." *Heller,* 128 S.Ct. at 626-27; *see also McDonald,*

28

130 S.Ct. at 3047. *But see* Marshall, *supra*, at 698 (arguing, based on the ratification history of the Second Amendment, that "(1) stripping a person of his right to keep and bear arms for a 'felony' conviction is constitutionally dubious unless the conviction was for a 'crime of violence,' a term having a longstanding yet flexible meaning specially developed for arms regulations; and (2) although some disability is plainly justified for persons convicted of crimes of violence, a lifetime ban on all keeping of firearms by such felons is also constitutionally dubious"). The Court emphasized that it "identif[ied] these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Heller*, 128 S.Ct. at 627 n.26; *see also City of New York v. Bob Moates' Sport Shop, Inc.*, 253 F.R.D. 237, 242 (E.D.N.Y. 2008) ("It cannot be concluded that *Heller* places in doubt all state and local control of guns required to protect citizens, particularly in urban communities. . . . To transmutate *Heller* into an inhibition on long standing ancient . . . powers of the state to control nuisances, the power of the federal government to regulate firearms that flow through the stream of interstate commerce, and the power of the federal judiciary in diversity cases to enforce that state substantive law is almost inconceivable.").

The Supreme Court has indicated that some form of heightened scrutiny is necessary when the conduct at issue falls within the core of the Second Amendment right to bear arms for the purpose of self-defense in the home. *See Heller*, 554 U.S. at 629 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."). Most courts of appeals have found that regulations which substantially burden the right to keep and to bear arms for the purpose of self-defense should receive intermediate scrutiny. *Nordyke v. King*, 644 F.3d 776, 786 (9th Cir. 2011); *United States*

*v. Masciandaro,* 638 F.3d 458, 469–70 (4th Cir. 2011); *United States v. Chester,* 628 F.3d 673, 680–83 (4th Cir. 2010); *United States v. Marzzarella,* 614 F.3d 85, 89 (3d Cir. 2010); *see also Heller v. District of Columbia,* 698 F.Supp.2d 179, 188 (D.D.C. 2010); *United States v. Reese,* 627 F.3d 792, 800-01 (10th Cir. 2010). *But see United States v. Engstrum,* 609 F.Supp.2d 1227, 1231–32 (D. Utah 2009) (applying strict scrutiny). By contrast, laws that do not substantially burden the right to keep and to bear arms for this purpose are not entitled to heightened scrutiny. *Nordyke,* 644 F.3d at 784. Courts have analogized the Second Amendment to the First, drawing on free speech jurisprudence to define what constitutes a substantial burden and the level of scrutiny necessary.

### 2. Substantial Burden

To evaluate the burden placed on a constitutional right by government regulation, courts examine whether the restriction leaves open sufficient alternative avenues for exercising that right. *E.g. Ward,* 491 U.S. at 791 (evaluating whether a restriction on the time, place, or manner of protected speech "leave[s] open ample alternative channels for communication of the information"). "Following this lead, when deciding whether a restriction . . . substantially burdens Second Amendment rights, we should ask whether the restriction leaves law-abiding citizens with reasonable alternative means for obtaining firearms sufficient for self-defense purposes." *Nordyke*, 644 F.3d at 787-88; *see United States v. Marzzarella,* 595 F.Supp.2d 596, 606 (W.D. Pa. 2009) (upholding the ban because it leaves "open ample opportunity for law-abiding citizens to own and possess guns," imposing only an "incidental and minimal" burden on the right to bear arms), *aff'd,* 614 F.3d at 95.

Statutes that criminalize access to guns by particular classes of individuals burden the Second Amendment right. *Reese,* 627 F.3d at 800 ("[T]here is little doubt that the challenged

law, § 922(g)(8), imposes a burden on conduct, i.e., Reese's possession of otherwise legal firearms, that generally falls within the scope of the right guaranteed by the Second Amendment.").

The statute at issue in this case falls within the core of the Second Amendment right. The restriction at issue here is different than the "presumptively lawful" prohibitions on gun possession by felons. Because of the presumption of innocence, it is assumed that the defendant is not guilty of the underlying indictment that triggers criminal liability. Thus, for purposes of construing the statute, a defendant under indictment is a "law-abiding citizen" who remains eligible for Second Amendment protections.

The prohibition imposed by the statute is temporary. It lasts only from indictment to conviction or acquittal. The burden it inflicts, however, is significant. While the statute does not prohibit individuals under indictment from owning or possessing guns for the purposes of self-defense in the home, it restricts their ability to acquire new weapons until they are acquitted of the offense for which they are charged. The law thus provides no reasonable alternative means for obtaining a firearm for self-defense purposes. Unless the defendant already possessed a firearm prior to his indictment, the statute can completely strip his ability to keep and bear arms for the purpose of self-defense in his home. This burden may last for a year or more. *See* Bureau of Justice Statistics, U.S. Dep't of Justice, *Compendium of Federal Justice Statistics, 2004* 63 (2004) (showing that the average case processing time for a felony was 10.1 months, but that some types of cases lasted more than twenty months on average).

Heightened scrutiny is required to justify the substantial burden imposed on indictees.

### 3. Level of Scrutiny

31

While the Supreme Court has indicated that heightened scrutiny is necessary for laws that infringe on core Second Amendment rights, it is unclear what kind of scrutiny should be applied. This court joins other Courts of Appeals in applying intermediate scrutiny to laws that substantially burden the right to bear arms.

In *Heller,* the Supreme Court declined to state what level of review is appropriate for statutes that infringe on the core Second Amendment right to bear arms for the purpose of self-defense. It stated that the right to bear arms is a fundamental right, *McDonald*, 130 S.Ct. at 3042, hinting that strict scrutiny could be appropriate, *see, e.g., Clark v. Jeter,* 486 U.S. 456, 461 (1988) ("[C]lassifications affecting fundamental rights ... are given the most exacting scrutiny.").

"Whether or not strict scrutiny may apply to particular Second Amendment challenges, it is not the case that it must be applied to all Second Amendment challenges." *Marzzarella,* 614 F.3d at 96. In *Heller*, the Court analogized the Second Amendment to the First Amendment.

> [T]he right [to bear arms] was not unlimited, just as the First Amendment's right of free speech was not . . . . Thus, we do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose.*

*Heller*, 554 U.S. at 594. Thus, like statutes affecting the fundamental right to free speech, statutes infringing on the right to bear arms could be subject to intermediate (or even lesser) scrutiny. *See United States v. O'Brien,* 391 U.S. 367, 377 (1968) (holding that content-neutral restrictions on the time, place, and manner of speech are subject to a form of intermediate scrutiny); *Int'l Soc'y for Krishna Consciousness v. Lee,* 505 U.S. 672, 678–79 (1992) (noting that limitations on expressive activity conducted in a nonpublic forum need only be reasonable, as long as they are viewpoint neutral).

Courts of appeals have adopted intermediate scrutiny to evaluate restrictions on gun possession by particular people or in particular places, analogizing these regulations to time, place, and manner restrictions on speech. *Marzzarella,* 614 F.3d at 96 (upholding 18 U.S.C. § 922(k), which prohibits the possession of firearms with obliterated serial numbers); *Skoien,* 614 F.3d at 641 (upholding 18 U.S.C. § 922(g)(9), which prohibits any person "who has been convicted in any court of a misdemeanor crime of domestic violence" from possessing firearms); *Chester*, 628 F.3d at 683 (same); *Masciandaro*, 638 F.3d at 473-74 (upholding prohibition on carrying a loaded firearm in a national park); *Reese,* 627 F.3d at 800 (upholding § 922(g)(8), which prohibits possession of a firearm by a person subject to a domestic protection order); *Heller v. District of Columbia*, --- F.3d ----, 2011 WL 4551558, at *10 (D.C. Cir. 2011) (*Heller II*) (remanding case to determine whether gun registration requirements survive intermediate scrutiny). Two district courts in this circuit have applied intermediate scrutiny to similar laws. *See United States v. Oppedisano*, No. 09-cr-0305, 2010 WL 4961663, at *2 (E.D.N.Y. Nov. 30, 2010) (holding that prohibition on possession of ammunition by a felon survived strict scrutiny as applied to a felon convicted of attempted reckless endangerment and driving while intoxicated); *Osterweil v. Bartlett*, --- F.Supp.2d ----, 2011 WL 1983340 (N.D.N.Y. May 20, 2011) (finding that New York State's gun licensing scheme survived intermediate scrutiny).

Intermediate scrutiny has been formulated in a number of ways. *Compare Skoien,* 614 F.3d at 641 (stating that the statute must be "substantially related to an important governmental objective"); *Reese*, 627 F.3d at 802 ("To pass constitutional muster under intermediate scrutiny, the government has the burden of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective." (internal quotations omitted)); *Heller II*, 2011 WL 4551558, at *10 ("To pass muster under intermediate scrutiny the

District must show [that the regulations at issue] are 'substantially related to an important governmental objective.'"); *United States v. Booker*, 644 F.3d 12, 25 (1st Cir. 2011) ("[A] categorical ban on gun ownership by a class of individuals must be supported by some form of "strong showing," necessitating a substantial relationship between the restriction and an important governmental objective."); *and Oppedisano*, 2010 WL 4961663, at *2 ("Viewed under intermediate scrutiny, a statute must be substantially related to the advancement of an important government interest."); *with Chester*, 628 F.3d at 683 (holding that there must be a "'reasonable fit' between the challenged regulation and a 'substantial' government objective"); and *Nordyke*, 644 F.3d at 776 (quoting *Unites States v. O'Brien*, 391 U.S. 367, 377 (1968) ("[A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.")).

The degree to which the statute must be tailored to the state interest is ambiguous.  In the equal protection context, intermediate scrutiny only requires that the law be substantially related to an important government interest. *Ramos v. Town of Vernon*, 353 F.3d 171, 175 (2d Cir. 2003) (distinguishing between two forms of heightened scrutiny: (1) strict scrutiny, under which a law will be upheld only if it is "narrowly tailored" to meet "compelling government objectives;" and (2) intermediate scrutiny, which requires that a law be "substantially related" to "important government objectives); *see also Heckler v. Mathews*, 465 U.S. 728, 744-45 (1984).  In the First Amendment context, intermediate scrutiny also requires that the statute be "narrowly tailored." *Ward*, 491 U.S. at 799; *see IMS Health Inc. v. Sorrell*, 630 F.3d 263, 275 (2d Cir. 2010) (holding, in the context of a First Amendment challenge, that "for the statute to survive

intermediate scrutiny, the government must assert a substantial state interest that is directly advanced by the statute, and the regulation must not be more extensive than necessary to achieve the government's interest"); *but see Citizens United v. Federal Election Comm'n,* 130 S.Ct. 876, 898 (2010) ("[S]trict scrutiny . . . requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." (internal quotation marks omitted)); *Federal Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 464 (2007) (same).

The "narrow tailoring" in the context of First Amendment intermediate scrutiny, however, does not require a perfect fit between the regulation and the government interest at stake.

> The requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation. . . . So long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less . . . restrictive alternative.

*Ward,* 491 U.S. at 799 (internal citations and quotations omitted); *but cf. O'Brien*, 391 U.S. at 376-77 ("[W]e think it clear that a government regulation is sufficiently justified . . . if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."). If the government made a "reasonable determination that its interest . . . would be best served" by a particular mode of regulation, the court must defer to that determination. *Ward,* 491 U.S. at 799.

Despite these different formulations, courts have applied intermediate scrutiny in similar ways in Second Amendment challenges. All formulations of intermediate scrutiny "require the asserted governmental end to be more than just legitimate, either 'significant,' 'substantial,' or

35

'important.'" *Marzzarella*, 614 F.3d at 97-98 (analyzing Supreme Court First Amendment cases applying intermediate scrutiny); *cf. O'Brien*, 391 U.S. at 376-77 ("To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong.  Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified . . . if it furthers an important or substantial governmental interest . . . .").  The fit between the regulation and the government interest at stake need only be reasonable.  *Marzzarella*, 614 F.3d at 97-98 (finding that all formulations of intermediate scrutiny "generally require the fit between the challenged regulation and the asserted objective be reasonable, not perfect"); *see also Skoien*, 587 F.3d at 805–06 ("Under intermediate scrutiny, the government need not establish a close fit between the statute's means and its end, but it must at least establish a *reasonable* fit."); *Chester*, 628 F.3d at 683; *Oppedisano*, 2010 WL 4961663, at *2 (citing *Ramos v. Town of Vernon*, 353 F.3d 171, 180 (2d Cir. 2003)).  The regulation "need not be the least restrictive means of serving the interest." *Marzzarella*, 614 F.3d at 98 (citing *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662 (1994) and *Ward*, 491 U.S. at 798-800).

Applying intermediate scrutiny, courts have upheld a number of restrictions on gun ownership and possession.  In *Marzzarella*, for example, the Court of Appeals for the Third Circuit held that a federal ban on transportation, receipt, and possession of any firearm which has had the importer's or manufacturer's serial number removed  was related to the "substantial or important" "law enforcement interest in enabling the tracing of weapons via their serial numbers." 614 F.3d at 98.  It "fits reasonably with that interest in that it reaches only conduct creating a substantial risk of rendering a firearm untraceable." *Id.* By contrast, the Court of Appeals for the Fourth Circuit concluded that the government had not yet "carried its burden of

establishing a reasonable fit between the important object of reducing domestic gun violence and § 922(g)(9)'s permanent disarmament of all domestic-violence misdemeanants. *Chester*, 628 F.3d at 683. While "[t]he government has offered numerous plausible *reasons* why the disarmament of domestic violence misdemeanants is substantially related to an important government goal; however, it has not attempted to offer sufficient *evidence* to establish a substantial relationship between § 922(g)(9) and an important governmental goal." *Id.; cf. Skoien,* 614 F.3d at 642 (upholding a prohibition on gun possession by misdemeanants convicted of domestic violence following a discussion of the empirical evidence supporting the relationship between the statute and the important government interest at stake). For the purposes of an as-applied challenge, courts have accepted evidence of the defendant's own violent past to show a substantial relationship between a statute and its objective of preventing access to guns. *United States v. Williams*, 616 F.3d 685, 693 (7th Cir. 2010) (upholding § 922(g)(1), which criminalizes gun possession by felons).

Intermediate scrutiny is the appropriate level of review for the statute at issue in the present case. *But see Masciandaro,* 638 F.3d at 471 ("[W]e assume that any law that would burden the "fundamental," core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny."). Unlike the total ban at issue in *Heller*, § 922(n) applies only to a narrow class of persons, rather than to the public at large. It is substantially similar to § 922(g)(9) and § 922(g)(8), the statutes at issue in *Skoien* and *Reese*, respectively. Both of those statutes prohibited the *possession* of firearms by narrow classes of persons who, based on their past behavior, are more likely to engage in domestic violence for an unlimited period. Section 922(n) is less restrictive than either of those statutes, since it only criminalizes shipping, transportation, or receipt of a firearm, not possession. It also only applies for the limited period

37

between indictment and either acquittal or conviction. Intermediate, not strict, scrutiny is appropriate.

### 4. 18 U.S.C. § 922(n)

Prior to *Heller*, several courts ruled that 18 U.S.C. § 922(n) and predecessor statutes did not violate the Second Amendment. *Rivero*, 218 Fed. Appx. at 958; *see also Cases*, 131 F.2d at 923. As already noted, no court has ruled on the constitutionality of the statute since *Heller*. Because it is substantially related to an important government interest, it survives strict scrutiny.

The prohibition at issue in this case is less restrictive than other subsections of 18 U.S.C. § 922, which totally ban possession by particular categories of people, such as felons or misdemeanants convicted of domestic violence. Courts have continued to uphold such provisions in the wake of *Heller*. *E.g. United States v. Barton*, 633 F.3d 168 (3d Cir. 2011) (holding that defendant's conviction for being a felon in possession of a firearm and ammunition did not violate his Second Amendment rights); *United States v. Scroggins,* 599 F.3d 433, 451 (5th Cir. 2010) (same); *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010) (same); *United States v. McCane,* 573 F.3d 1037, 1047 (10th Cir. 2009) (same); *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010) (upholding statute prohibiting gun possession by illegal drug users); *United States v. White*, 593 F.3d 1199, 1205-06 (11th Cir. 2010) (holding that Second Amendment was not violated by statutory prohibition against possession of firearms by persons convicted of misdemeanor crime of domestic violence). *But see Britt v. State,* 681 S.E.2d 320, 323 (2009) (finding that a felon convicted in 1979 of one count of possession of a controlled substance with intent to distribute had a constitutional right to keep and bear arms under the North Carolina Constitution). They have survived intermediate scrutiny. *Skoien,* 614 F.3d at

38

641 (upholding 18 U.S.C. § 922(g)(9), which prohibits any person "who has been convicted in any court of a misdemeanor crime of domestic violence" from possessing firearms).

The statute is arguably overbroad. Given the presumption of innocence, the government's categorical presumption that all individuals under indictment are more likely to misuse firearms is somewhat suspect. *See* Part V(C), *supra; see also* Bureau of Justice Statistics, U.S. Dep't of Justice, *Compendium of Federal Justice Statistics, 2004* 54 (2004) (stating that, in 2004, only 1.8% of felony defendants violated the terms of their pre-trial release by committing any other crime).

As the shown by the facts of this case of this case, however, it cannot be said that the statute is not substantially related to the important government interest in public safety, and that "no set of circumstances . . . under which [the statute] would be valid." *Salerno*, 481 U.S. at 745. Laurent was initially indicted in state court for crimes arising out of gun play in a residential building. He was then subsequently arrested after allegedly robbing another individual at gun point. The fact that Laurent was charged with the instant crime because he apparently committed a crime of violence while under indictment undermines any claim he has that § 922(n) is not substantially related to preventing him from committing further violence.

Nor is it unconstitutional as applied to this defendant. The fact that Laurent may eventually plead to a misdemeanor is not of statutory or constitutional significance. So long as the government can show that he was under indictment for a felony at the time he received a firearm, he may be convicted under § 922(n).

The statute survives intermediate scrutiny.

### E. Equal Protection

The indictment does not violate Laurent's right to the equal protection of the laws.

The Fourteenth Amendment's Equal Protection Clause by its terms is only applicable to the states. U.S. Const. amend. XIV ("No *State* shall . . . deny to any person within its jurisdiction the equal protection of the laws." (emphasis added)). While the Fifth Amendment does not contain an explicit equal protection clause, it has been interpreted to provide the same basic safeguards. *See Schneider v. Rusk*, 377 U.S. 163, 168 (1964); *Shapiro v. Thompson*, 394 U.S. 618, 642 (1969); *Bolling v. Sharpe*, 347 U.S. 497, 497 (1954). The principles of the former thus apply to the latter. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995); *see also United States v. Paradise,* 480 U.S. 149, 166 n.16 (1987) (plurality op.) ("[T]he reach of the equal protection guarantee of the Fifth Amendment is coextensive with that of the Fourteenth"); *Weinberger v. Wiesenfeld,* 420 U.S. 636, 638 n.2 (1976) ("This Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment."); *Buckley v. Valeo,* 424 U.S. 1, 93 (1976) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment"). Heightened scrutiny is applied when legislative classifications affect fundamental rights or employ a suspect classification, such as race. *Hayden v. Paterson,* 594 F.3d 150, 169–70 (2d Cir. 2010); *see also Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 547 (1983). By contrast, "[i]n areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993); *Hayden v. Paterson,* 594 F.3d at 169-70.

Courts have previously held that § 922(n) and its predecessors do not violate the equal protection principles protected by the Due Process Clause. *See Craven*, 478 F. 2d at 1338-39; *Thoresen*, 428 F.2d 654; *Weingartner*, 485 F. Supp. at 1172. These decisions were based on the assumption that "shipping or transporting firearms in interstate commerce is not a fundamental right." *Craven*, 478 F. 2d at 1338-39; *see also Thoresen*, 428 F.2d at 662. The statute was thus evaluated under rational basis scrutiny.

To the extent that § 922(n) infringes on the Second Amendment right to bear arms, it is subject to heightened scrutiny. For the reasons discussed in Part IV(D), it survives such scrutiny.

To the extent that § 922(n) distinguishes between individuals under indictment and others, it does not burden the presumption of innocence and need only survive rational basis scrutiny. *See* Part V(B). Although potentially overbroad, it cannot be concluded that Congress' concluding that individuals under indictment are more likely to misuse firearms than the general population was irrational. *See Cases*, 131 F.2d at 921 ("[C]ertainly no one can seriously contend that the test of unfitness which Congress established[--whether a defendant is under indictment for a felony—]is irrelevant to that purpose [public safety]."); *see also  Thoresen*, 428 F.2d at 662 ("[I]t is not unreasonable for Congress to conclude that there is considerable likelihood that one indicted for such an offense has a propensity to misuse firearms."); S. Rep. No. 98-225, p. 3 (1983), U.S. Code Cong. & Admin. News 1984, pp. 3182, 3185 (remarking on "the alarming problem of crimes committed by persons on [pre-trial] release" in discussing the Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq.*). Laurent's own criminal history shows that limitations on access to guns by indictees may be in the public interest.

**F.  Procedural Due Process**

The requirements of procedural due process are different from those imposed by the Second Amendment or other substantive provisions. A statute may survive scrutiny, but nevertheless be implemented in an unfair manner.

The Due Process Clause of the Fifth Amendments prohibits the state and federal governments from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amend. V. This clause protects both procedural and substantive rights. "When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner. . . .This requirement has traditionally been referred to as 'procedural due process.'" *Salerno*, 481 U.S. at 746. "Procedural due process rules are meant to protect persons . . . from the mistaken or unjustified deprivation of life, liberty, or property." *Carey v. Piphus,* 435 U.S. 247, 259 (1978). It not only prevents the state from withdrawing benefits from those who are entitled to them, *see Mathews v. Eldridge,* 424 U.S. 319 (1976), but from depriving individuals of their rights wrongfully and needlessly. The Supreme Court has thus used procedural due process to determine the appropriate standard of proof required for civil commitment, *Addington v. Texas*, 441 U.S. 418 (1979); whether a defendant may be deprived of his liberty and detained pre-trial, *United States v. Salerno*, 481 U.S. 739 (1987); and whether an undocumented immigrant may be so deprived and detained pending deportation, *Demore v. Kim*, 538 U.S. 510 (2003). Individuals under indictment equally have a due process right not to be needlessly deprived of their liberties, including their Second Amendment rights.

Under procedural due process, "standard analysis . . . proceeds in two steps: We first ask whether there exists a liberty . . . interest of which a person has been deprived, and if so we ask whether the procedures followed . . . were constitutionally sufficient." *Swarthout v. Cooke*, 131

42

S.Ct. 859, 862 (2011). To determine whether there have been sufficient procedures, courts rely on the test articulated in *Mathews,* balancing 1) "the private interest that will be affected by the official action;" 2)"the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" 3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335.

Categorical prohibitions on access to guns have been struck down as violating procedural due process. The Adam Walsh Amendments mandate, among other things, that a defendant charged with a child pornography offense be required to "refrain from possessing a firearm" as a condition of pre-trial release. 18 U.S.C. § 3142(c)(1)(B). Several courts have held that the Amendments violate due process because they "establish that an arrest on the stated charges, without more, irrebuttably establishes that such conditions are required, thereby eliminating the accused's right to an independent judicial determination as to required release conditions, in violation of the right to procedural due process . . . under the Fifth Amendment." *United States v. Crowell,* Nos. 06-M-1095, 06-CR-291, 06-CR-304, 2006 WL 3541736, at *10 (W.D.N.Y. Dec. 7, 2006); *United States v. Arzberger,* 592 F. Supp. 2d 590 (S.D.N.Y. 2008); *cf. United States v. Polouizzi,* 697 F.Supp.2d 381 (E.D.N.Y. 2010) (holding that requirement that individuals under arrest for child pornography charges be required to undergo electronic monitoring as a condition of pre-trial release unconstitutional).

### 1. Private Interest at Stake

As discussed extensively in Part V(D), the instant statute divests indictees of a fundamental right—the right to bear arms. The consequences of this deprivation are severe. Section § 922(n) not only denies an individual of their right to bear arms—it also permits the

43

government to charge that individual with a new substantive offense and to impose additional punishment as a result. By comparison, violations of judicially imposed conditions of pre-trial release are followed only by remand to custody pending trial, not additional charges.

### 2. Risk of Erroneous Deprivation

Categorical prohibitions on the liberties of arrestees and indictees are exceedingly rare. *See* Part IV(B). An individual determination of risk is the norm.

In *Salerno*, the Court upheld the constitutionality of the Bail Reform Act's provision permitting "pretrial detention on the ground that the arrestee is likely to commit future crimes" against a procedural due process challenge. *Id.* at 744, 750. The provision withstood constitutional scrutiny precisely because it included procedural protections—including an individualized finding of risk to the public from failure to impose a specific requirement—which are wholly absent from § 922(n). *Id.* at 750, 751-52 (internal citations omitted) (emphasis added).

Without an individual determination of risk, erroneous deprivation is likely in at least some cases. While individuals with a history of violent offenses may reasonably be suspected of continuing this pattern while awaiting trial, the same cannot be said categorically of individuals with no criminal background under indictment for non-violent crimes. Section § 922(n) forecloses any individualized judicial consideration, requiring unjustified burdens on all accused persons, even those who present no risks. "There is no basis for categorically depriving persons who are merely accused of certain crimes the right to legal possession of firearms." *Arzberger*, 592 F. Supp. 2d at 602.

### 3. Government Interest at Stake

44

As a general matter, the government's interest in preventing crime by indictees is compelling. *See* Part II(C), *supra*. Since the statute is interpreted as requiring the defendant to know that he has been indicted and thereafter knowingly receive guns, the government's interest is narrow and clear. The indictment itself provides sufficient process to stamp the defendant as likely more dangerous than the general population. It would take a particularly brazen and dangerous individual to engage in a gun transaction while knowingly under a felony indictment.

To ensure that there is some evidence that the defendant received the gun *after the indictment*, the government will be required to outline its evidence at a hearing, having given notice of its proposed proof to defendant in advance. Should it fail to show a substantial ground supporting this element of the offense, the indictment will be dismissed, but not on the merits.

## VI.    Conclusion

Both on its face and as applied to this defendant, § 922(n) violates neither the Second Amendment, nor the Fifth Amendment's notice requirement, nor equal protection. While the instant statute does not violate the presumption of innocence, the existence of this presumption necessarily reflects on the constitutionality of restrictions on other constitutional rights premised on an indictment. Categorical restrictions on the rights of indictees are suspect. In the present case, the government must have reasonable grounds to support the charge that the defendant received the gun *after* he became aware of the indictment, or the indictment will be dismissed on procedural due process grounds. No finding on the merits is made that would imply application of double jeopardy.

45